# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JAMIE ANN MONEYHUN,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:14cv00027 |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | **REPORT AND RECOMMENDATION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

## *I. Background and Standard of Review*

Plaintiff, Jamie Ann Moneyhun, ("Moneyhun"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Moneyhun protectively filed an application for DIB on June 20, 2008, alleging disability as of March 1, 2007, due to fibromyalgia, chronic back pain, depression, bipolar disorder, bone spurs, shoulder pain, anxiety and difficulty sleeping. (Record, ("R."), at 259-62, 278, 282, 317, 326.) The claim was denied initially and on reconsideration. (R. at 249-56.) Moneyhun then requested a hearing before an administrative law judge, ("ALJ"), (R. at 247-48.) A hearing was held on December 10, 2010, at which Moneyhun was represented by counsel. (R. at 585-603.)

By decision dated January 3, 2011, the ALJ denied Moneyhun's claim. (R. at 167-78.) Moneyhun then requested review of the ALJ's decision, and the Appeals Council remanded the case for further consideration because it was determined that recently posted earnings extended Moneyhun's date last insured from December 31, 2007, to September 30, 2010. (R. at 195-96.) On May 15, 2012, an ALJ held a supplemental hearing, at which Moneyhun was represented by counsel. (R. at 556-84.)

By decision dated June 22, 2012, the ALJ denied Moneyhun's claim. (R. at 115-30.) The ALJ found that Moneyhun met the nondisability insured status requirements of the Act for DIB purposes through September 30, 2010. (R. at 117.)

-2-

The ALJ also found that Moneyhun had not engaged in substantial gainful activity from March 1, 2007, her alleged onset date, through September 30, 2010.[1] (R. at 117.) The ALJ found that the medical evidence established that, through the date last insured, Moneyhun suffered from a combination of severe impairments, namely chronic fatigue syndrome; scoliosis of the lumbar spine; chronic low back syndrome with right radiculopathy; osteoarthritis of the cervical spine; obesity; status-post arthroscopic surgery for a partial right rotator cuff tear and osteoarthritis of the shoulder; bipolar/depressive disorder; and anxiety, but she found that Moneyhun did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 118.) The ALJ also found that, through the date last insured, Moneyhun had the residual functional capacity to perform simple, routine, repetitive, low-stress light work[2] that required only frequent balancing, stooping, kneeling, crouching, crawling and climbing of ramps and stairs; that required only occasional interaction with co-workers and supervisors; and that did not require exposure to ladders, ropes or scaffolds, reaching above shoulder level with her upper extremities, exposure to vibrating surfaces, unprotected heights or heavy machinery with rapid moving parts and no interaction with the public. (R. at 126.) The ALJ found that, through her date last insured, Moneyhun was unable to perform any past relevant work. (R. at 128.) Based on Moneyhun's age, education, work history and residual functional capacity and the testimony of a vocational

---

[1] Therefore, Moneyhun must show that she became disabled between March 1, 2007, the alleged onset date, and September 30, 2010, the date last insured, in order to be entitled to DIB benefits.

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b)(2014).

-3-

expert, the ALJ found that there were other jobs available that Moneyhun could perform such as a merchandise marker, an office mail clerk and a housekeeper. (R. at 129.) Thus, the ALJ found that Moneyhun was not under a disability as defined under the Act during the relevant time period and was not eligible for benefits. (R. at 130.) *See* 20 C.F.R. § 404.1520(g) (2014).

After the ALJ issued her decision, Moneyhun pursued her administrative appeals. The Appeals Council set aside an initial decision denying her request for review and considered additional information. (R. at 7-11, 106-10.) Ultimately, however, the Appeals Council again denied Moneyhun's request for review of the ALJ's decision. (R. at 7-11.) Moneyhun then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2014). The case is before this court on the Commissioner's motion for summary judgment filed January 28, 2015.[3] Neither party has requested oral argument.

## II. Facts

Moneyhun was born in 1959, (R. at 259, 278, 559), which classified her as a "younger person" under 20 C.F.R. § 404.1563(c) on the alleged onset date, but as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d) by her date last insured. Moneyhun has a high school education and vocational training as a licensed practical nurse. (R. at 288, 560.) She has past relevant work experience as a licensed practical nurse and a manager of an online business. (R. at 283,

---

[3] Moneyhun, who is proceeding pro se in this case, did not file a motion for summary judgment, but did file a brief on November 26, 2014, requesting that her claim be remanded to the ALJ. (Docket Item No. 8.)

-4-

312A.)

Moneyhun testified at her May 15, 2012, hearing that she was treating her back pain with heat, rest, ibuprofen and pain medication. (R. at 562.) She stated that she had not been hospitalized or seen at the emergency room for psychological treatment. (R. at 563.) Moneyhun stated that she had been diagnosed with post-traumatic stress disorder, ("PTSD"), due to the loss of her mother and nearly losing her son as a result of viral acute hemolytic anemia. (R. at 563.) She stated that she last abused alcohol in 2005. (R. at 574.) Moneyhun stated that she occasionally had a beer with dinner when on vacation. (R. at 575.) She was arrested in 2005 for trespassing and being drunk in public. (R. at 575.)

Dr. H. Alexander, M.D., a board-certified specialist in internal medicine and rheumatology, testified as an independent medical expert at Moneyhun's hearing. (R. at 569-73.) Dr. Alexander opined that during the period under review, Moneyhun's impairments, either singly or in combination, did not meet or medically equal any listed impairment. (R. at 572.) However, he stated that Moneyhun's right shoulder problems affected her ability to reach. (R. at 572.)

Psychologist Gary Bennett, Ph.D., also testified as a psychological expert at Moneyhun's hearing. (R. at 573-80.) Bennett noted that there was nothing in the record to support the diagnosis of bipolar psychosis, which was repeatedly mentioned by Dr. Ford, (R. at 576), and no evidence in the record that supported an opinion that Moneyhun had work-preclusive mental restrictions. (R. at 576-77.) Bennett stated that Moneyhun's principal diagnoses were major depressive disorder and generalized anxiety disorder. (R. at 578.) Based on these diagnoses,

-5-

Bennett stated that Moneyhun had mild limitations on her ability to perform activities of daily living and moderate limitations on her ability to maintain social functioning. (R. at 578.) He stated that there was no evidence in the record indicating that Moneyhun had experienced episodes of decompensation. (R. at 578.) Bennett further testified that Moneyhun's mental impairments, either individually or in combination, did not satisfy the criteria of any listed impairment. (R. at 578.) He opined that Moneyhun retained the ability to perform low-stress work involving no interaction with the general public, only occasional interaction with supervisors and co-workers and simple, repetitive tasks. (R. at 578-79.)

Vocational expert, Mark Hileman, also testified at Moneyhun's hearing. (R. at 580-84.) Hileman classified Moneyhun's work as a licensed practical nurse as medium,[4] light as performed on occasion, and skilled and her work as an online business manager as light, medium as performed, and skilled. (R. at 582.) Hileman was asked to consider a hypothetical individual of Moneyhun's age, education and work experience, who would be limited to simple, routine, repetitive, unskilled, light work that did not require her to climb ladders, ropes or scaffolds, to work around unprotected heights or heavy machinery with rapidly moving parts, that required no more than frequent climbing of stairs and ramps, balancing, bending, stooping, crouching, crawling and kneeling, that did not require reaching above shoulder level bilaterally, that did not require more than occasional interaction with co-workers and supervisors and that did not require interaction with the general public. (R. at 582.) Hileman stated that such an individual could not perform

---

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2014).

-6-

Moneyhun's past relevant work. (R. at 582.) Hileman stated that there would be other jobs available that existed in significant numbers that such an individual could perform, including jobs as a marker, an office mail clerk and a housekeeping cleaner. (R. at 582-83.) Hileman next testified that an individual with the limitations set forth in the November 18, 2010, Physical Residual Functional Capacity Questionnaire completed by Dr. Ford could not perform Moneyhun's past work. (R. at 582.) Hileman stated that, if the same hypothetical individual could sit, stand or walk for only two hours in an eight-hour workday, there would be no jobs available that she could perform. (R. at 583.)

In rendering his decision, the ALJ reviewed medical records Dr. Timothy G. McGarry, M.D.; Dr. Michael Ford, M.D.; Susan Meyers, L.C.S.W., a licensed clinical social worker; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Dr. Frank M. Johnson, M.D., a state agency physician; Eugenie Hamilton, Ph.D., a state agency psychologist; Dr. Richard Surrusco, M.D., a state agency physician; and Joseph I. Leizer, Ph.D., a state agency psychologist. Moneyhun's attorney also submitted additional medical evidence from Dr. Ford and Lanthorn to the Appeals Council.[5]

The record shows that Dr. Michael Ford, M.D., treated Moneyhun from 2006 through 2009 for various complaints, including sore throat, allergy symptoms, right shoulder pain and weight gain. (R. at 371-84, 447-58.) At most visits, Dr. Ford documented no particular examination findings or noted that her

---

[5] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 7-11, 106-10), this court also must take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

-7-

physical examination was "ok." (R. at 371-84, 447-58.) Dr. Ford did occasionally note lumbosacral pain and right shoulder tenderness. (R. at 375, 456.) On June 11, 2007, Moneyhun reported that she was feeling better than she had in a long time. (R. at 376.) On April 30, 2008, Moneyhun reported some relief of her lower back pain with medication and heat. (R. at 373.) Dr. Ford administered injections into Moneyhun's right shoulder on two occasions. (R. at 451, 456.) Dr. Ford intermittently noted Moneyhun's diagnoses as scoliosis causing her low back syndrome; lumbar radiculopathy; bipolar disorder; hypoglycemic episode; constipation; migraines; right shoulder pain; and chronic fatigue syndrome. (R. at 370-84, 447-58.) Dr. Ford ordered numerous diagnostic studies. In February 2008, an x-ray of Moneyhun's lumbosacral spine showed curvature of her lumbar spine to the left. (R. at 352, 402.) In March 2008, an MRI of Moneyhun's lumbar spine showed levoscoliosis. (R. at 361-62, 400-01.) In July 2008, x-rays of Moneyhun's cervical spine showed straightening of the cervical lordosis and moderate facet joint arthritis from the C5 through T1 levels. (R. at 407.) Chest x-rays showed no evidence of acute disease. (R. at 408.)

On April 13, 2009, x-rays of Moneyhun's right shoulder showed mild changes of arthritis of the acromioclavicular joint and calcific tendinitis of the supraspinatus tendon. (R. at 452.) On June 5, 2009, an MRI of Moneyhun's right shoulder showed degenerative arthritis at the glenohumeral and acromioclavicular joints and partial thickness tear of the rotator cuff tendon. (R. at 454-55.) On June 26, 2009, Dr. Ford noted that Moneyhun's examination was normal. (R. at 456.) On November 18, 2010, Dr. Ford reported that Moneyhun's lungs were clear to ascultation bilaterally, with no wheezing. (R. at 36.) Moneyhun displayed no atrophy or weakness, intact joints and normal gait. (R. at 36.) Dr. Ford reported

-8-

that Moneyhun displayed no signs of depression or anxiety. (R. at 36.) Moneyhun reported that she had quit smoking and consuming alcoholic beverages. (R. at 36.) In April 2009, x-rays of Moneyhun's right shoulder showed mild changes of arthritis of the acromioclavicular joint and calcific tendinitis of the supraspinatus tendon. (R. at 452.) On May 26, 2010, x-rays of Moneyhun's left foot showed a small calcaneal spur. (R. at 542.)

On November 18, 2010, Dr. Ford completed a Physical Residual Functional Capacity Questionnaire indicating that Moneyhun was diagnosed with bipolar psychosis, cervical spine neuropathy, early diabetes, alcohol abuse and chronic obstructive pulmonary disease, ("COPD"). (R. at 468-72.) He found that Moneyhun had pain in her left shoulder and arm. (R. at 468.) Dr. Ford opined that Moneyhun's psychological conditions included depression, somatoform disorder, anxiety and personality disorder (bipolar). (R. at 469.) He opined that Moneyhun experienced constant pain that was severe enough to interfere with her ability to maintain attention and concentration. (R. at 469.) Dr. Ford opined that Moneyhun was incapable of performing even low-stress jobs. (R. at 469.) He opined that Moneyhun could walk one to two city blocks without interruption or severe pain. (R. at 469.) He found that Moneyhun could sit less than two hours in an eight-hour workday and that she could do so for 10 minutes without interruption and that she could stand and/or walk a total of two hours in an eight-hour workday and that she could do so for 30 minutes without interruption. (R. at 469-70.) Dr. Ford opined that Moneyhun would need to walk around every 30 minutes for up to 10 minutes at a time. (R. at 470.) He also indicated that Moneyhun would require a job that permitted her to shift positions and to take unscheduled work breaks. (R. at 470.) Dr. Ford found that Moneyhun could rarely lift and carry items weighing 10

-9-

pounds. (R. at 470.) He found that Moneyhun could rarely twist, stoop and climb stairs and never crouch or climb ladders. (R. at 471.) He opined that Moneyhun would be absent from work more than four days per month due to her impairments. (R. at 471.)

On November 22, 2010, Dr. Ford wrote a letter in support of Moneyhun's disability claim. (R. at 474-75.) Dr. Ford noted that Moneyhun had to quit work as a result of bipolar psychosis, which made it difficult to work with co-workers. (R. at 474-75.) He also noted that Moneyhun had significant cervical spine neuropathy. (R. at 474.) Dr. Ford noted that Moneyhun had recently been able to overcome her significant alcohol abuse. (R. at 474.) He reported that Moneyhun had smoked heavily until recently and that she suffered from COPD. (R. at 474.) Dr. Ford noted that Moneyhun's lesser diagnoses that played a role in her illness included a hiatal hernia with esophageal stricture, chronic fatigue, menopausal syndrome, significant weight gain, daily urinary incontinence and an old rotator cuff injury to her right shoulder that was repaired, from which Moneyhun had "pretty much recovered." (R. at 474.) He noted that Moneyhun had chronic left shoulder and arm pain. (R. at 474.) Dr. Ford noted that Moneyhun was disabled from performing her regular nursing job, as well as any job requiring interpersonal relationships with the public. (R. at 475.)

By letter dated January 12, 2011, Dr. Ford reported that Moneyhun was unable to perform basic household duties such as sweeping, mopping or dusting furniture. (R. at 544-45.) He stated that diagnostic tests showed that Moneyhun was anemic from time to time, and she experienced significant fluctuations in blood sugar levels. (R. at 544.) Dr. Ford stated that Moneyhun experienced side

-10-

effects from her medications, such as drowsiness and dizziness. (R. at 544.) He stated that Moneyhun lacked basic problem solving skills and had difficulty completing tasks due to lack of concentration, resulting from her bipolar disorder. (R. at 544.) Dr. Ford stated that Moneyhun was unable to work independently, which could cause her job performance to be below standard. (R. at 544.)

On February 27, 2007, Moneyhun was evaluated by Susan Meyers, L.C.S.W., a licensed clinical social worker at Solutions Counseling, LLC, for depression. (R. at 364-66.) Moneyhun stated that she wanted to deal with her depression without the use of alcohol. (R. at 364.) She reported sexual, verbal and emotional abuse. (R. at 365.) Moneyhun reported no prior mental health treatment. (R. at 364.) Meyers observed that Moneyhun had a depressed mood; anxious affect; intact orientation and thought process; no paranoia or delusions; and limited insight and judgment. (R. at 366.) Meyers diagnosed dysthymia, generalized anxiety disorder and alcohol abuse. (R. at 366.) She assessed Moneyhun's then-current Global Assessment of Functioning score, ("GAF"),[6] at 50,[7] with her GAF score being 55[8] during the prior year. (R. at 372.) Moneyhun attended one follow-up visit in March 2007, during which Meyers noted the same mental status findings as the prior visit. (R. at 369.) Moneyhun failed to show for two scheduled

---

[6] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[7] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

[8] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms...  OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

-11-

visits and participated in no specialized mental health treatment for the remainder of the relevant period. (R. at 367-68.)

On January 28, 2009, Eugenie Hamilton, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Moneyhun suffered from a nonsevere affective disorder. (R. at 413-25.) Hamilton opined that Moneyhun had no restriction on her activities of daily living. (R. at 423.) She found that Moneyhun had mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, but had experienced no repeated episodes of decompensation of extended duration. (R. at 423.) Hamilton opined that there was no evidence of a severe mental impairment. (R. at 425.)

On May 21, 2009, Joseph I. Leizer, Ph.D., a state agency psychologist, completed another PRTF, indicating that Moneyhun suffered from a nonsevere affective disorder, anxiety-related disorder and substance addiction disorder. (R. at 431-41.) Leizer opined that Moneyhun had no restriction on her activities of daily living, no difficulties in maintaining social functioning or in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 441.)

On July 23, 2009, Dr. Timothy G. McGarry, M.D., saw Moneyhun for her complaints of right shoulder pain. (R. at 518-20.) Moneyhun denied trauma, but reported taking care of her invalid mother and that heavy lifting worsened her pain. (R. at 518.) On examination, Moneyhun exhibited a normal gait and station; she denied neural deficits or neck pain; and she was neurovascularly intact, except for

-12-

abnormal right shoulder findings. (R. at 519.) Dr. McGarry suggested various treatment options, and Moneyhun elected to pursue arthroscopic surgery, which she underwent in September 2009. (R. at 519, 527-28.) At a post-surgical visit on October 2, 2009, Moneyhun reported almost complete resolution of her right shoulder pain. (R. at 517.) Dr. McGarry observed normal examination findings, and he advised Moneyhun to avoid active abduction, heavy lifting and overhead repetitive lifting "for the time being." (R. at 517.) On November 12, 2009, Moneyhun reported doing "extremely well" after the surgery with almost complete pain relief and improved strengthening and range of motion in her right shoulder. (R. at 510.) Moneyhun complained of neck pain. (R. at 510.) Examination of Moneyhun's right shoulder revealed some mild neck tenderness and one small trigger point, but good neck range of motion, and she exhibited full muscle strength, intact sensation and symmetric deep tendon reflexes. (R. at 510.) Moneyhun was alert, well-groomed and appropriate during the examination. (R. at 510.)

On November 3, 2010, Moneyhun reported that her right shoulder was doing "extraordinarily well" and denied any significant right shoulder problems. (R. at 515.) Moneyhun complained of right trapezius tenderness. (R. at 515.) Dr. McGarry reported that Moneyhun's right shoulder examination was entirely normal. (R. at 515.) Moneyhun appeared neurovascularly intact, but exhibited some tenderness in her trapezius region and limited range of motion in her neck. (R. at 515.) Dr. McGarry recommended that Moneyhun increase her activities to tolerance with respect to her right shoulder. (R. at 516.) On November 19, 2010, an MRI of Moneyhun's cervical spine showed mild facet arthrosis on the right from the C4-C5 through C6-C7 disc spaces. (R. at 65, 508.) An MRI of Moneyhun's

thoracic spine showed small anterior osteophytes at the T11-T12 levels and incidental root sleeve cysts at the T10-T11 and T11-T12 levels. (R. at 509.)

On November 28, 2012, Dr. McGarry examined Moneyhun for complaints of problems with both knees, as well as her left shoulder. (R. at 94-96.) Dr. McGarry noted that Moneyhun was in no acute distress. (R. at 95.) She stood with normal station and walked with no discernible limp. (R. at 95.) Examination of Moneyhun's left shoulder revealed significant tenderness to palpation and positive impingement sign. (R. at 95.) She had limited range of motion in her left shoulder. (R. at 95.) Examination of Moneyhun's right knee revealed mild tenderness about the patellofemoral joint with limited range of motion; however, no instability was noted, and she had normal muscle strength. (R. at 95.) Dr. McGarry diagnosed bilateral knee pain with early evidence of mild patellofemoral syndrome and chondromalacia of the patella; and internal derangement of the left shoulder with evidence of possible rotator cuff involvement. (R. at 95.) Conservative treatment was recommended. (R. at 96.) Dr. McGarry opined that Moneyhun should avoid any type of kneeling or squatting. (R. at 96.) An injection of Moneyhun's left shoulder was given, and Moneyhun agreed to going forward with a left shoulder scope. (R. at 96.)

On June 2, 2011, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Moneyhun upon referral from Dr. Ford. (R. at 486-92.) Moneyhun reported that she had provided "significant care" to her mother, who was an alcoholic and had a heart condition, during the final four years of her life until she passed away in February 2011. (R. at 486.) She also reported that her 12-year-old son became seriously ill on the day of her mother's funeral. (R. at 487.)

-14-

Lanthorn reported that Moneyhun showed no signs of bipolar disorder. (R. at 488.) Moneyhun reported that she occasionally became angry, but that this had improved. (R. at 488.) Lanthorn reported that Moneyhun displayed a depressed and anxious mood. (R. at 487.) According to a Personality Assessment Inventory, ("PAI"), Moneyhun had marked anxiety and tension and significant depression, which could severely restrict her day-to-day functioning. (R. at 489.) The PAI also indicated that Moneyhun had experienced a disturbing traumatic event in the past, namely her son's 2011 illness. (R. at 489.) Lanthorn diagnosed generalized anxiety disorder; moderate, recurrent major depressive disorder; chronic pain disorder associated with both psychological factors and general medical conditions; and PTSD. (R. at 490-91.) Lanthorn assessed Moneyhun's then-current GAF score at 50 to 55. (R. at 491.) Lanthorn opined that Moneyhun would have mild to moderate limitations in her ability to interact with the general public, co-workers and supervisors, to sustain concentration and to deal with changes and requirements in the workplace. (R. at 492.)

Lanthorn completed a mental assessment indicating that Moneyhun had an unlimited ability to understand, remember and carry out simple instructions. (R. at 493-94.) He found that Moneyhun had a limited, but satisfactory, ability to understand, remember and carry out detailed instructions and to maintain personal appearance. (R. at 494.) Lanthorn opined that Moneyhun had a seriously limited, but not precluded, ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to deal with work stresses, to function independently, to maintain attention and concentration, to understand, remember and carry out complex instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R.

-15-

at 493-94.)

On April 18, 2012, Lanthorn completed a mental assessment indicating that Moneyhun had an unlimited ability to understand, remember and carry out very short and simple instructions. (R. at 502-06.) He opined that Moneyhun had a limited, but satisfactory, ability to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being unduly distracted; to make simple work-related decisions; to ask simple questions or request assistance; and to deal with stress of semiskilled and skilled work. (R. at 504-05.) Lanthorn opined that Moneyhun had a seriously limited, but not precluded, ability to remember work-like procedures; to maintain regular attendance and be punctual within customary, usually strict tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; to respond appropriately to changes in a routine work setting; to deal with normal work stress; to understand and remember detailed instructions; to set realistic goals or make plans independently of others; to interact appropriately with the general public; to maintain socially appropriate behavior; and to adhere to basic standards of neatness and cleanliness. (R. at 504-05.) He opined that Moneyhun could not satisfactorily perform at a consistent pace without an unreasonable number and length of rest periods and could not satisfactorily carry out detailed instructions. (R. at 504-05.)

On December 16, 2013, Lanthorn reported that Moneyhun was seen by him on June 2, 2011; December 9, 2011; April 10, 2012; December 3, 2012; March 13,

2013; August 26, 2013; and December 2, 2013. (R. at 552-54.) Lanthorn reported that during the course of treatment, Moneyhun consistently reported significant depression and anxiety. (R. at 553.) Moneyhun displayed a consistently depressed mood, fatigue, inappropriate guilt about past events and difficulties with concentration and memory. (R. at 553.) Lanthorn reported that it was unlikely that Moneyhun could deal with the stress involved with her prior job or deal with the public. (R. at 553.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2014); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2014).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must

-17-

consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Moneyhun argues that substantial evidence does not support the ALJ's finding that she was not disabled at any time during the relevant period. (Correspondence dated November 25, 2014, (Docket Item No. 8), ("Plaintiff's Brief"), at 1-2.) In particular, Moneyhun argues that the ALJ erred by substituting her own opinion over that of her treating physician. (Plaintiff's Brief at 1.) She further argues that the ALJ erred by failing to give greater weight to the opinions of Dr. Ford and Lanthorn. (Plaintiff's Brief at 1-2.)

The ALJ found that the medical evidence established that, through the date last insured, Moneyhun suffered from a combination of severe impairments, namely chronic fatigue syndrome; scoliosis of the lumbar spine; chronic low back syndrome with right radiculopathy; osteoarthritis of the cervical spine; obesity; status-post arthroscopic surgery for a partial right rotator cuff tear and osteoarthritis of the shoulder; bipolar/depressive disorder; and anxiety, but she found that Moneyhun did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 118.) The ALJ also found that, through the date last insured, Moneyhun had the residual functional capacity to perform simple, routine, repetitive, low-stress light work that required only frequent balancing, stooping, kneeling, crouching, crawling and climbing of ramps and stairs; occasional interaction with co-workers and supervisors; and that did not require exposure to ladders, ropes or scaffolds, reaching above shoulder level with her upper

extremities, exposure to vibrating surfaces, unprotected heights or heavy machinery with rapid moving parts and no interaction with the public. (R. at 126.)

Moneyhun argues that substantial evidence does not exist to support the ALJ's finding that she is not disabled. (Plaintiff's Brief at 1-2.) She also argues that the ALJ erred by failing to give greater weight to the opinions of Dr. Ford and Lanthorn. (Plaintiff's Brief at 1-2.) Based on my review of the record, I find these arguments unpersuasive. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(c)(2) (2014). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

In this case, the ALJ gave little weight to the opinions of Dr. Ford and Lanthorn because they conflicted with the overall evidence, Moneyhun's daily activities and the medical opinions of independent medical experts, Dr. Alexander and psychologist Bennett. (R. at 128.) The ALJ noted that Lanthorn administered only a PAI during his evaluation that required Moneyhun's subjective responses and that the physical examination portions of Dr. Ford's treatment records generally were blank. (R. at 128.) Dr. Ford's treatment records usually documented no particular physical examination findings or simply indicated that Moneyhun's physical examinations were "ok." (R. at 371-84, 447-58.) In fact, nothing in Dr.

-19-

Ford's treatment records suggested that Moneyhun experienced debilitating physical or mental limitations. (R. at 371-84, 447-58.) In November 2010, Dr. Ford noted that Moneyhun displayed no atrophy or weakness, intact joints and normal gait. (R. at 36.) His progress reports generally illustrated that Moneyhun's various conditions were managed through routine office visits and the use of medications. (R. at 371-84, 447-58.) Dr. Alexander reviewed the record and testified at Moneyhun's hearing, stating that, during the period under review, Moneyhun's impairments, either singly or in combination, did not meet or medically equal any listed impairment. (R. at 572.) In fact, the only limitation he found was in Moneyhun's ability to reach due to her right shoulder problems. (R. at 572.)

The ALJ noted that Lanthorn appeared to base his disability opinion exclusively upon the subjective statements Moneyhun made in response to the PAI test. (R. at 128, 489-90.) Lanthorn found that Moneyhun displayed good grooming and hygiene and a depressed and anxious mood, and she denied suicidal or homicidal ideations. (R. at 487-88.) In November 2009, Dr. McGarry noted that Moneyhun was alert, well-groomed and appropriate during the examination. (R. at 510.) In November 2010, Dr. Ford reported that Moneyhun displayed no signs of depression or anxiety. (R. at 36.) In addition, Lanthorn's opinion is unsupported by Moneyhun's mental health treatment prior to the expiration of her insured status, which comprised of taking medications prescribed by Dr. Ford and attending two individual counseling sessions. (R. at 364-84, 447-58.) Bennett reviewed the record and testified that Moneyhun's principal diagnoses were major depressive disorder and generalized anxiety disorder. (R. at 578.) He stated that Moneyhun had mild limitations on her ability to perform activities of daily living and moderate limitations on her ability to maintain social functioning. (R. at 578.)

-20-

Bennett stated that Moneyhun retained the ability to perform simple, low-stress, repetitive work involving no interaction with the general public and only occasional interaction with supervisors and co-workers. (R. at 578-79.)

Based on this, I find that the ALJ properly weighed the medical evidence and that substantial evidence exists to support her finding that Moneyhun was not disabled during the relevant period.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's weighing of the medical evidence;

2. Substantial evidence exists in the record to support the ALJ's finding with regard to Moneyhun's residual functional capacity; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Moneyhun was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

-21-

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2014):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record and unrepresented parties at this time.

DATED:     September 4, 2015.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE